NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230889-U

NO. 4-23-0889

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 30, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| RASHAUN JEFFERSON, | ) | No. 22CF495 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Robert Randall Wilt, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding that the trial evidence was sufficient to prove defendant guilty beyond a reasonable doubt of drug-induced homicide and that defendant failed to show that unusual circumstances were present that precluded a finding of proximate cause.

¶ 2   Defendant, Rashaun Jefferson, appeals his conviction for drug-induced homicide. Defendant argues the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of drug-induced homicide and that the State failed to prove that he proximately caused the victim's death. We affirm.

¶ 3                    I. BACKGROUND

¶ 4   Defendant was charged with drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2020)) in that he knowingly and unlawfully delivered fentanyl, a controlled substance, to another

and caused the death of David Young when Young ingested any amount of that substance. Defendant was also charged with delivery of a controlled substance (fentanyl) (720 ILCS 570/40l(d)(iii) (West 2020)).

¶ 5        The matter proceeded to a jury trial. Dawn Hake testified that Young, who was her close friend, came to her apartment on November 15, 2021. They obtained and used drugs together that night. Hake could not remember which dealer she purchased the drugs from. They both used crack cocaine throughout the night, and Hake alone also used fentanyl. Hake had never seen Young use fentanyl before. Hake stated she had been using fentanyl on and off for approximately 18 years, and she used it daily both at the time of the incident and presently.

¶ 6        On the morning of November 16, 2021, Young was still at Hake's residence. Hake called and texted an individual whom she knew as " 'The Dude' " to purchase more drugs. She asked him to bring her " 'hard' " and " 'soft,' " meaning crack cocaine and fentanyl, respectively. Hake identified defendant in court as "The Dude." She stated she did not know defendant's real name on the day of the incident, but she had been purchasing drugs from him since April or May 2021. After Hake contacted defendant, he drove to her apartment building in a dark blue or black "Jeep Cherokee." Hake met with defendant at his vehicle and exchanged money for crack cocaine and fentanyl. Hake went back into her apartment, and she and Young shared the crack cocaine. Hake used the fentanyl. She then texted defendant and stated that the quality of the drugs was poor. Defendant returned to her apartment building in the same vehicle he had driven before, and she went out to meet him. Defendant provided Hake with different fentanyl to try, but he did not bring more crack cocaine.

¶ 7        Hake testified that she returned to her apartment, and Young was disappointed that defendant had not brought them more crack cocaine. He asked Hake if he could use some of

the fentanyl. Hake told him he could not use it because it had made her life difficult, she got sick without it, and she did not want to be responsible for him using it. Hake placed the fentanyl defendant had given her on a plate in the kitchen and left the room to lock the door. When she returned, Young had "cut out a line of the Fentanyl." They debated whether he should use it. He then reduced the amount of fentanyl in the line and snorted it.

¶ 8 Hake went into the bathroom to inject some of the fentanyl. She and Young were talking at that time. When she returned, Young was "very high but still responding." She then messaged defendant to tell him that the second type of fentanyl he gave her was much better. She went to the bathroom to inject more fentanyl, but while she was in there, Young stopped responding to her. Hake walked over to Young and found him on his knees, drooling excessively. This occurred 10 to 20 minutes after Young snorted the fentanyl. Hake administered Narcan to Young and waited two to five minutes to see if it would take effect. While she was waiting, she used the rest of the fentanyl defendant had given her. The Narcan did not have any effect on Young, so Hake called 911. Emergency medical technicians arrived and transported Young to the hospital.

¶ 9 Hake testified that she spoke with the police on the day of the incident. The police asked her to get the license plate number on the vehicle defendant was driving that day if she ever saw it again. She saw the vehicle again two to three days later, obtained its license plate number, and communicated that information to a police officer.

¶ 10 Hake testified that, at the time she purchased drugs from defendant on the day of the incident, it was possible that there were still "bags of dope" around her residence, but she did not remember. She acknowledged that she had told a police officer that she knew "a million dealers." Defense counsel asked Hake if, at the time she went downstairs for the second fentanyl

delivery, there was "Fentanyl—at least powered [*sic*] Fentanyl all over [her] apartment." Hake replied that she did not know. Later in the trial, a certified copy of Hake's 2017 felony conviction for retail theft was admitted into evidence.

¶ 11 Terry Hayes, a police officer with the Loves Park Police Department, testified that he interviewed Hake at the police station on the day of the incident concerning the circumstances that led to Young's presumed overdose. During the interview, Hake described the person she purchased the drugs from as a "35- to 40-year-old black male." She indicated he had short hair, was clean shaven, and had "kind of a skinnier build." She did not know his height because he never got out of his vehicle during their transactions. She believed he had been shot in the leg over the summer, and he wore a necklace with some initials, including an "L." She stated he drove a dark blue or black "Jeep Cherokee," but she did not know the license plate number.

¶ 12 Hayes stated that, based on Hake's description of the dealer, he believed it might be defendant. He created a photographic lineup containing six photographs, including defendant's photograph in position number two. Another officer, Matthew Anderson, presented the lineup to Hake. Anderson testified that Hake selected the second photograph and told Anderson she believed this person was "The Dude." The photographic lineup was admitted into evidence.

¶ 13 Hayes testified that an officer extracted information from Hake's phone while she was at the police station. Hayes reviewed the extraction, which included text messages exchanged between Hake and an individual she had saved in her phone under the name "The Dude." Copies of these text messages were admitted into evidence. The text message records showed Hake texted The Dude at approximately 9:30 a.m. on November 16, 2021, and requested "2 hard and 1 soft." The Dude replied, "Here," at approximately 10 a.m. Approximately two

hours later, Hake texted The Dude and complained about the quality of what she had received. At 12:35 p.m., The Dude texted Hake and told her to "come ou[t]." Hake said, "Okay." At 12:47 p.m., Hake texted the Dude stating, "Yeah it's way better."

¶ 14　　　Hayes testified that he asked Hake to let him know the license plate number on the vehicle The Dude was driving if she ever saw it again. Hake sent him a text message with the license plate number two or three days after her interview. Hayes ran the license plate number through a law enforcement database and learned it was registered to an individual other than defendant. He also ran the license plate through a license plate reader system, which showed that the vehicle was detected by a camera approximately one mile from Hake's residence at 12:41 p.m. on the day of the incident.

¶ 15　　　Hayes testified he began conducting surveillance on defendant. On November 22, 2021, Hayes drove past defendant's mother's residence, and he saw the Jeep described by Hake in the parking lot. On December 6, 2021, Hayes again observed this vehicle at defendant's mother's residence and saw defendant driving it. On March 3, 2022, Hayes again observed defendant drive up to his mother's apartment building in the vehicle in question. Officers subsequently had the vehicle towed from the parking lot, and Hayes searched it a few days later. He discovered a cell phone bill with defendant's name on it and a Western Union payment slip, for which defendant was the sender.

¶ 16　　　Christopher Fidecki, a trooper with the Illinois State Police, testified that, on February 11, 2022, he conducted a traffic stop on a Jeep Grand Cherokee driven by defendant after he observed the vehicle commit a traffic violation. The trial evidence showed this vehicle had the same license plate number as the one Hayes later had towed.

¶ 17 Richard Herter testified that he owned a business that sold used vehicles. Herter testified that in September 2021, a woman purchased a 2014 Jeep Grand Cherokee from his business. Defendant was with the woman when she purchased the vehicle. Defendant had previously been at the car lot several times to look at vehicles, and Herter was familiar with him. A vehicle owned by defendant was traded in as part of the sale when the Jeep Grand Cherokee was purchased. A bill of sale with the vehicle identification number (VIN) was introduced into evidence. Previously admitted evidence showed the Jeep Grand Cherokee that Herter sold had the same VIN as the one searched by Hayes.

¶ 18 Mark Peters, a forensic pathologist, testified that he conducted an autopsy on Young's body on November 24, 2021. Peters testified that Young was taken to the hospital on November 16, 2021, and was resuscitated. Young was declared brain dead on November 19, 2021, and he was placed on a respirator until November 24, 2021. At that time, some of Young's organs were donated, including his heart, lungs, liver, and kidneys. When Peters examined Young's body, there was a midline incision because these organs had been donated.

¶ 19 Peters testified that, because Young's heart was donated, he was not able to examine it to determine whether there were any internal abnormalities. However, Peters stated that Young's organs would not have been approved for donation if they contained any diseases or defects. Peters stated Young's brain was very soft due to anoxic injury and because he had been brain dead and on a respirator for several days. The internal examination was otherwise normal, and Peters did not find any evidence of natural diseases or defects.

¶ 20 Peters testified that he determined the cause of death by relying on the toxicology results and the reported circumstances of Young's death. The toxicology results showed Young's blood alcohol level was 0.206, which would not be a lethal amount for an average adult male.

The results also showed Young also had Narcan and benzoylecgonine, an inactive byproduct of cocaine, in his system. Additionally, the toxicology results showed Young had three nanograms per milliliter of fentanyl in his system. Peters testified that this amount of fentanyl could be lethal, though it would be at the lower level of lethal doses. It could also be a therapeutic level of fentanyl where used in a medical setting, though it would be "the upper level of therapeutic."

¶ 21        Peters determined that Young died of cardiopulmonary arrest—*i.e.*, when a person's heart stops beating and he or she stops breathing—caused by the adverse effects of fentanyl. Peters stated he was able to determine that this was the cause of death even though the heart had been donated based on the circumstances of Young's death. Peters stated that it was reported to him that, after ingesting fentanyl, Young immediately collapsed and was later resuscitated. Peters stated: "Because of the prolonged period of lack of heartbeat and lack of breathing, though, his brain suffered unrecoverable anoxic injury." Peters explained that fentanyl was a "very strong central nervous system depressant," and it could cause hypotension and immediate collapse. He stated that ingesting fentanyl could cause people to pass out, and it could also "turn[ ] off" the "autonomic effects that control the heartbeat and the respiration and the blood pressure." Peters stated there was no standard amount of time between the ingestion of fentanyl and when the central nervous system would be suppressed; it could be immediate or happen hours later.

¶ 22        The jury found defendant guilty of both drug-induced homicide and delivery of a controlled substance. The trial court sentenced defendant to 15 years' imprisonment for drug-induced homicide, and the delivery of a controlled substance count merged with the drug-induced homicide count.

¶ 23        This appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25        On appeal, defendant argues the State failed to prove him guilty beyond a

reasonable doubt of drug-induced homicide. Defendant also argues the State failed to prove that

he proximately caused Young's death in light of the "unusual circumstances" present in this

case. We first address defendant's general argument that the trial evidence was insufficient and

then separately address his contention that the State failed to prove he proximately caused

Young's death.

¶ 26                          A. Sufficiency of the Evidence

¶ 27        Defendant argues the State failed to prove him guilty beyond a reasonable doubt

of drug-induced homicide. Specifically, defendant contends the State failed to prove that he

delivered fentanyl to Hake because there was no corroboration for Hake's identification of

defendant as the dealer from whom she received the fentanyl. Defendant also contends the State

failed to prove the substance he allegedly delivered contained fentanyl because the substance

was never chemically tested. Defendant further claims the evidence showed other fentanyl was

present in Hake's apartment that he did not deliver, and the only evidence that Young ingested

fentanyl allegedly delivered by him was Hake's incredible testimony. Defendant also notes that

Peters never examined Young's heart and merely speculated that it was normal because it was

harvested for donation.

¶ 28        "When considering the sufficiency of the evidence, we determine whether, after

viewing the evidence in the light most favorable to the State, any rational trier of fact could have

found the required elements of the crime beyond a reasonable doubt." *People v. Galarza*, 2023

IL 127678, ¶ 25. "It is the responsibility of the trier of fact to resolve conflicts in the testimony,

weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL

118674, ¶ 12. Thus, we will not substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of witnesses. *Id.* "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 29    In order to prove defendant guilty of the offense of drug-induced homicide, the State was required to establish that (1) defendant unlawfully delivered a controlled substance to another in violation of section 401 of the Illinois Controlled Substances Act (720 ILCS 570/401 (West 2020)) and (2) "any person's death [was] caused by the injection, inhalation, absorption, or ingestion of any amount of that controlled substance." 720 ILCS 5/9-3.3(a) (West 2020). "Deliver" in this context "means the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not there is an agency relationship." 720 ILCS 570/102(h) (West 2020). Fentanyl is a controlled substance within the meaning of the statute. See *id.* §§ 102(f), 206(c)(8).

¶ 30    Here, the trial evidence, viewed in the light most favorable to the State, was sufficient to prove that defendant delivered fentanyl to Hake and that Young's death was caused by ingesting some amount of that fentanyl. Hake, a regular fentanyl user, testified that she obtained fentanyl on the day of the incident from a dealer she knew only as "The Dude," and she brought it to her apartment. Hake observed Young snort some of this fentanyl, and she ingested the rest. To Hake's knowledge, Young had not used fentanyl prior to that occasion. Hake stated that Young collapsed shortly after snorting the fentanyl, and she administered Narcan and called 911. The trial evidence showed that Young was then taken to the hospital and subsequently died. Peters testified that Young's toxicology results showed he had an amount of fentanyl in his system which could be lethal, and Peters opined Young's cause of death was cardiopulmonary

arrest caused by adverse effects of fentanyl. Peters stated he was able to determine Young's cause of death even without examining his heart, and it was within the province of the jury to determine the weight to give to his testimony. See *Bradford*, 2016 IL 118674, ¶ 12.

¶ 31 The trial evidence, viewed in the light most favorable to the State, was also sufficient to prove defendant was "The Dude." On the day of the incident, Hake described "The Dude" to police officers, told them he drove a dark blue or black "Jeep Cherokee," and identified defendant as "The Dude" in a photographic lineup. She subsequently obtained the license plate number of the vehicle she had described to the officers, and officers observed defendant driving it on multiple occasions. The State also presented evidence that a vehicle owned by defendant was traded in to purchase the subject Jeep. Hake also identified defendant as "The Dude" in court during her trial testimony.

¶ 32 We reject defendant's argument that there was insufficient evidence to prove he was "The Dude" because Hake's testimony was not credible. Defendant contends that Hake was under the influence of drugs during the incident, which raised concerns about the accuracy of her memory. Defendant also argues she had a motive to lie in order to shift the blame for Young's death from herself to another person. Defendant also notes that Hake had a prior felony conviction for retail theft, and he argues her oral description of "The Dude" as being 35 to 40 years old with a "skinnier build" and a necklace with an "L" on it was inconsistent with him because he was only 28 years old, was not " 'skinny' " and did not have the letter "L" in his name.

¶ 33 We find a rational trier of fact could have found Hake's testimony to be credible. Hake's account of the events leading up to Young's collapse was clear and consistent. She identified defendant in a photographic lineup on the same day as the incident and described his

vehicle to police officers, later obtaining a license plate number for the vehicle. Hake's account of the incident was partially corroborated by evidence connecting the vehicle to defendant and showing it had been near Hake's residence close to the time of the incident. Though Hake's oral description of "The Dude" may have been somewhat inconsistent with defendant's appearance, it was the province of the jury to resolve inconsistencies in the evidence, and its assessment that Hake's identification of defendant was credible was reasonable based on the trial evidence. See *People v. Jackson*, 2020 IL 124112, ¶ 66 ("It is the function of the jury as the trier of fact to assess the credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence.").

¶ 34　　　We also reject defendant's argument that the State failed to prove that the substance defendant allegedly delivered to Hake contained fentanyl because the substance was never forensically tested. Defendant cites *People v. Jones*, 174 Ill. 2d 427 (1996), in support of his argument. In *Jones*, the defendant was convicted of possessing 1.4 grams of a controlled substance with the intent to deliver (a Class 1 felony) after being found in possession of five separate bags containing a white rocky substance. *Id.* at 428. Two of the bags tested positive for the presence of cocaine, and the remaining three were not tested. *Id.* The appellate court reduced the defendant's conviction to the Class 2 felony version of possession of a controlled substance with the intent to deliver, finding the trial evidence established only that the defendant possessed 0.59 grams of a controlled substance. *Id.* The supreme court affirmed the judgment of the appellate court. *Id.* at 430.

¶ 35　　　The *Jones* court stated that the weight of the substance was an essential element of the possession offense that was required to be proven beyond a reasonable doubt. *Id.* at 428-29. The court stated that chemists need not test every sample seized when "the seized samples

are sufficiently homogenous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested." *Id.* at 429. However, when samples are not sufficiently homogenous, a portion of each container or sample must be tested to determine its contents. *Id.* The *Jones* court found that, without more, no inference could be drawn concerning the contents of the three untested packets in that case. *Id.* at 430. The court found that the question of whether the untested packets contained cocaine or a mere lookalike substance was "pure conjecture." *Id.*

¶ 36 Here, unlike in *Jones*, the State was not required to prove that defendant possessed a certain weight of a substance containing fentanyl in order to prove him guilty of drug-induced homicide. See 720 ILCS 5/9-3.3(a) (West 2020). Peters testified that that he determined that Young died from cardiopulmonary arrest caused by the adverse effects of fentanyl. Also, Hake testified that she used fentanyl daily, used some of the substance defendant delivered, said it was fentanyl, and observed Young snort this same substance. Nothing in *Jones* necessitates a finding that the foregoing evidence was insufficient to prove that the substance defendant delivered in this case contained fentanyl.

¶ 37 B. Proximate Causation

¶ 38 Defendant also argues the trial evidence did not establish that he proximately caused Young's death "in light of the intervening circumstances and unusual lack of physical evidence." Defendant contends that the unusual circumstances in the instant case included insufficient trial evidence, the fact that Young died after consuming "only a small, therapeutic dose" of fentanyl, and that an intervening act broke the chain of proximate causation. Specifically, defendant contends that Hake's delivery of some of the fentanyl to Young or

Young's theft of some of the fentanyl from Hake (depending on how one interprets the evidence) was such an intervening act.

¶ 39        "Generally, when a crime requires both an act by defendant and a specified result of that act, the defendant's act must be both the 'cause in fact' of the result and the 'proximate' or 'legal' cause of the result." *People v. Nere*, 2018 IL 122566, ¶ 31. To establish proximate cause,

> "the result that actually occurs 'must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result.' " *Id.*

¶ 40        Our supreme court stated in *Nere* that, "[b]arring unusual circumstances," proximate or legal cause will not be at issue in drug-induced homicide cases. *Id.* ¶ 31 n.4. The court noted that the drug-induced homicide statute "already spells out what act a defendant must commit, what harm must occur, and how the harm must occur, and the only mental state requirement is the defendant's knowing delivery of a controlled substance." *Id.* See *People v. Faircloth*, 234 Ill. App. 3d 386, 391 (1992) ("The defendant just needs to make a knowing delivery of a controlled substance, and if any person then dies as a result of taking that substance, the defendant is responsible for that person's death."). The *Nere* court further noted that "the federal courts in construing the analogous portion of the federal Controlled Substances Act [citation] have concluded *** that there is no foreseeability requirement." *Nere*, 2018 IL 122566, ¶ 31, n.4.

¶ 41        Here, many of the "unusual circumstances" defendant identifies do not relate to the issue of proximate causation, but are merely challenges to the sufficiency of the trial evidence. Defendant asserts this case was unusual because the State failed to introduce corroborated evidence that a drug delivery occurred, forensic evidence verifying the identity of the controlled substance, or medical evidence "conclusively tying the substance to the homicide." However, we have already determined that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the evidence sufficient to prove defendant guilty beyond a reasonable doubt of drug-induced homicide.

¶ 42        Defendant also argues the fact that Young dying after consuming "a small, therapeutic dose" constituted an unusual circumstance, precluding a finding of proximate cause. Additionally, he contends that Hake's act of delivering some of the fentanyl to Young or Young's act of stealing it from Hake (depending on how one views the evidence) was an intervening act that broke the chain of proximate causation. See *People v. Brackett*, 117 Ill. 2d 170, 176 (1987) ("The courts in Illinois have repeatedly held that an intervening cause completely unrelated to the acts of the defendant does relieve a defendant of criminal liability."). Defendant notes that Hake was a daily fentanyl user and argues he could not have foreseen that delivering fentanyl to her would cause the death of another person he may not have known about.

¶ 43        We find that Young's death after consuming a low-lethal amount of the fentanyl defendant provided to Hake was not the type of unusual circumstance the *Nere* court suggested could result in a lack of proximate causation. It is neither unusual nor unforeseeable that a controlled substance a dealer delivers to one individual could ultimately be consumed by another. Nothing in the drug-induced homicide statute requires that the person to whom the

- 14 -

defendant delivers the controlled substance must be the same person whose death is caused by the ingestion of that substance. In fact, the plain language of the statute indicates this need not be the case. See 720 ILCS 5/9-3.3(a) (West 2020) ("A person commits drug-induced homicide when he or she violates Section 401 of the Illinois Controlled Substances Act *** by unlawfully delivering a controlled substance to another, and *any person's death* is caused by the injection, inhalation, absorption, or ingestion of any amount of that controlled substance." (Emphasis added.)). Also, an individual dying after consuming a low-lethal amount of fentanyl is not an unusual or unforeseeable circumstance.

¶ 44          As we have discussed, viewed in the light most favorable to the State, the trial evidence established that Young died from the effects of consuming some amount of the fentanyl that defendant knowingly delivered to Hake. While defendant may not have known that the fentanyl he delivered to Hake would ultimately be consumed by another individual who did not regularly use fentanyl, the only mental state requirement for drug-induced homicide was defendant's knowing delivery of a controlled substance. *Nere*, 2018 IL 122566, ¶ 31, n.4; *Faircloth*, 234 Ill. App. 3d at 391 ("The defendant just needs to make a knowing delivery of a controlled substance, and if any person then dies as a result of taking that substance, the defendant is responsible for that person's death."). There was no evidence that Young's death was caused by some intervening event unrelated to defendant's delivery of fentanyl. See *People v. Boand*, 362 Ill. App. 3d 106, 143 (2005) ("[T]he drug-induced-homicide statute is satisfied by a showing that the death was proximately caused by the delivery of the controlled substance.").

¶ 45          Finally, defendant asserts that our holding would lead to the "absurd" result that there is no "limiting principle" to the drug-induced homicide statute and that any number of deliveries or thefts could be traced back to the original seller for a death occurring months or

years later, after the drugs changed hands multiple times. Defendant argues that "[c]riminal liability should begin and end at the person who delivered the drugs to the decedent—Hake." Defendant cites *In re D.F.*, 208 Ill. 2d 223, 230 (2003), for the proposition that "[a] court *** is not bound by the literal language of a statute that produces a result inconsistent with clearly expressed legislative intent, or that yields absurd or unjust consequences not contemplated by the legislature."

¶ 46    We find defendant has not shown that the alleged lack of a "limiting principle" to the drug-induced homicide statute is either absurd or was not contemplated by the legislature. In *Faircloth*, the Third District appellate court described the drug-induced homicide statute as "a unique statute that imposes criminal responsibility for the death of a person on *anyone in the chain of delivery* of controlled substances that were the cause of that person's death." (Emphasis added.) *Faircloth*, 234 Ill. App. 3d at 391. It is not apparent that the legislature intended, as defendant contends, that only the last person to deliver a controlled substance to the victim should be found guilty of drug-induced homicide. There is nothing in the language of the drug-induced homicide statute that would limit its reach in this manner, and, in the absence of statutory ambiguity, we are not at liberty to read into the statute limitations that the legislature did not express. *People v. Laubscher*, 183 Ill. 2d 330, 337 (1998) ("Where an enactment is clear and unambiguous, this court is not at liberty to read into it exceptions, limitations, or conditions that the legislature did not express; nor should this court search for any subtle or not readily apparent intention of the legislature.").

¶ 47         III. CONCLUSION

¶ 48    For the reasons stated, we affirm the trial court's judgment.

¶ 49    Affirmed.